Laramore, Judge,
delivered the opinion of the court:
These consolidated actions are brought ,by some 1,800 plaintiffs to recover additional retired pay for the period June 1, 1958 to October 1, 1963. Each plaintiff is a retired officer, or legal representative of a deceased officer, of one of the Armed Forces, the Public Health Service or the Coast and Geodetic Survey. Prior to June 1, 1958, each officer represented here was receiving retired pay computed as a percentage of the “monthly basic pay” of his retired grade. See, e.g., 10 U.S.C. §3991 (Army), §6325 (Navy), §8991 (Air Force) (1958 Ed.). As a general rule, the retired grade was equivalent to the active duty grade held on the date of retirement, so each officer benefited from any pay increase given to an officer of like rank serving on active duty. See 10 TT.S.C. § 3961 (1958 Ed.) (Army); Career Compensation Act of 1949, § 201, ch. 681, 63 Stat. 802, 805-807, as amended, 37 TJ.S.C. § 232(a) (Supp. IV, 1952 Ed.) (all services). In 1958, legislation was enacted which amended the Career Compensation Act of 1949. Act of May 20, 1958, 72 Stat. 122. Included in the new legislation were certain provisions relating to retirement pay which defendant interpreted as meaning that officers retired before the effective date of the Act were entitled only to their pre-effective date retirement pay plus six percent. Sections 3-4, 6-7. Plaintiffs received retirement pay computed in this manner until October 1, 1963, when they became entitled to retirement pay based on the active duty pay rates that became effective on June 1, 1958. Uniformed Services Pay Act of 1963, § 5, 77 Stat. 210, 212-215. Plaintiffs concede that the 1963 legislation was prospective only; they base their claims on the 1958 legislation, alleging that it preserved the retirement-pay-based-on-active-duty-pay scheme.
In support of its motion to dismiss, defendant argues that section 3 (a) of the 1958 Act expressly prohibits the increased retired pay claimed by plaintiffs. Part of this argument is that section 4(b) does not except plaintiffs from 3(a)’s broad scope. Plaintiffs, of course, argue the contrary and have filed with their motion for summary judgment a long and confusing brief setting forth their answer to defendant’s *554 argument and making other arguments as well. We view the dispute over sections 3 (a) and 4(b) as the primary issue.
The disputed sub-sections provide as follows:
Sec. 3. (a) Notwithstanding any other provision of law, except sections 4 and 1 of this Act and subsection (b) of this section, the changes in rates of basic pay made by this Act do not increase the amount of retired pay, retirement pay, retainer pay, or equivalent pay to which any person is entitled on the day before the effective date of this Act.
Sec. 4. (b) Notwithstanding any other provision of law, a member of a uniformed service retired under any provision of law, or transferred to the Fleet Reserve or Fleet Marine Corps Reserve, on the effective date of this Act shall have his retired pay or retainer pay computed on the basis of the rates of basic pay set forth in the Career Compensation Act of 1949, as amended by this Act, or on the rates of basic pay set forth in the Career Compensation Act of 1949 on the day before the effective date of this Act, plus 6 per centum of that pay, whichever is greater.
Defendant’s argument is quite simply that unless plaintiffs are excepted by section 4(b), their retirement pay must continue to be based on the “basic pay” rates in effect “before the effective date of this Act.”[1] And the argument goes that section 4(b) cannot apply because plaintiffs were not “retired under any provision of law, or transferred to the Fleet Reserve or Fleet Marine Corps Reserve, on the effective date of this Act * * Plaintiffs argue that they were “retired * * * on the effective date of this Act.” They point out that defendant’s construction would limit section 4(b) to persons who actually retire on or become retired on the effective date of the Act which they say would be an absurd result. Either interpretation is possible; neither is completely satisfying. Thus, if defendant is correct, section 4(b) applies only to those persons who retire on June 1,1958. *555 If this is the legislative intent, we would prefer to have a provision unencumbered by ambiguity. If plaintiffs are correct, we would seem to be reading part of section 4(a) out of the statute. See footnote 1, supra. Only the legislative history can help us to carry out the purpose of the disputed provisions, and in this case the legislative history is very helpful indeed.
In recommending to the Senate that the 1958 military pay act be passed, the Committee on Armed Services reported that legislation was needed “to establish a career force for the military services.” The Committee prefaced the report with the following quote from the Joint Chiefs of Staff:
The Joint Chiefs of Staff believe there is a vital need to increase the overall attractiveness of the professional military career in relation to its civilian counterparts in private industry. It is believed that a program of long-range incentives designed to this end is a matter of the highest priority in order to obtain the requisite high professional level in our military force. [S. Eep. No. 1472, 85th Cong., 2d Sess. (1958); 2 U.S. Code Cong. & Ad. News 2465 (1958).]
The report continued with a statistical survey which showed the low incidence of re-enlistment and the negative effect on military operations of the resulting shortage of experienced personnel. Under a heading entitled “Objective of the Bill” was the following statement:
The basic objective of this legislation is to provide a military pay system designed to attract and retain qualified personnel for active career service. [2 U.S. Code Cong. & Ad. News 2467 (1958).]
In short, the Committee envisaged this as a bill to encourage able officers and enlisted men to stay in the uniformed services and to attract young men to become career officers and enlisted men.
Consistent with this purpose, the bill increased the basic pay which had previously been set by the Career Compensation Act of 1949, as amended, supra. The minimum increase was six percent. This reflected the “cost-of-living in *556 crease since the enactment of the previous military pay legislation in 1955.” 2 U.S. Code Cong. & Ad. News 2473 (1958). The maximum increases were given to the higher ranking officers and enlisted men, “the aim * * * [being] to provide an incentive for young officers and enlisted men to aspire to higher grades.” 2 U.S. Code Cong. & Ad. News 2474 (1958). Immediately succeeding the discussion of the basic pay increases came the following explanation of the bill’s effect on persons already retired:
The bill as passed by the House provided in effect that members retired before the effective date of the act would receive a flat 6-percent increase except for those on the retired list in the grade of lieutenant general, or equivalent, or general, and equivalent.
The 'Senate committee amended the House provision by deleting the language permitting those on the retired list in 3- and 4-star rank to recompute their retired pay ■under the new rates of the bill. If recomputation were permitted for these 2 ranks, it would result in an increase of 54 percent for those in the rank of general, or equivalent, and 39 percent for those in the rank of lieutenant general, or equivalent, as compared to a flat 6 percent for all others retired. The committee was of the opinion that it would not be equitable to permit two pay grades to recompute, with the resulting increases, as contrasted to the other ranks who are extended only a flat 6-percent increase.
The Senate committee also added language which would (1) require at least 1 year of continuous active duty after recall from a retired status in order to recompute under the new rates of the bill; (2) require 2 years of continuous active duty in order to recompute under the rates of the bill for those who were recalled from a retired status in a higher rank received as a result of honorary promotions in the Navy and Marine Corps; and (3) clarified the hill so as to make certain that those persons retiring on the effective date of the hill would retire under the new rates. [Emphasis added.] [2 U.S. Code Cong. & Ad. News 2474-2475 (1958).]
This general statement was particularized in the sectional analysis of the bill. Following is the Committee’s discussion of the provisions in dispute:
*557 SECTION 3.-PROVISIONS RELATING TO THOSE RETIRED Before Effective Date of the Act
Subsection (a) — Continuation of present rates of retired pay for those currently retired
The purpose of subsection 3 (a) is to continue the rates of retired pay in effect before the effective date of the act for persons retired or granted retired pay before that date. This subsection contains exceptions to other parts of the bill which increase or otherwise affect the rates of those currently retired.
‡ i*c ❖
Section 4
Subsection (a) — Six percent for those already retired
Section 4 provides a 6 percent increase in retired pay to persons retired before the effective date of this act. Certain exceptions are made in the case of persons covered by section 7 of this act and persons with 2 or less years of service for basic pay purposes who are retired before the enactment of this act for physical disability. This bill does not provide any increase for any persons with less than 2 years of cumulative service. Persons retired before the effective date of this act with that amount of service have been given a 6 percent increase under section 5 of the Career Incentive Act of 1955.
Subsection (b) — Persons retired on effective date of bill
This subsection would affect only members who become entitled to retired pay under any provision of law, or to retainer pay, on the effective date of this act by providing that their retired or retainer pay would be computed under the new rates of the bill or the old rates plus 6 percent, whichever is greater. This provision is necessary because the existing language of several of the retirement statutes would otherwise require persons retired on the effective date of the act to have their rates computed under the old rates without the benefit of the 6 percent increase provided by subsection (a). [2 U.S. Code Cong. & Ad. News 2485-2486 (1958).]
Finally, in the Conference Report, the conferees discussed the Senate amendments to the House passed bill and noted that “[b]oth the House bill and the Senate amendment provided a 6-percent increase in retired pay for all individuals *558 now on the retired list.” Conf. Rep. No. 1701, 85th. Cong., 2d Sess., p. 14 (1958); 2 U.S. Code Cong. & Ad. News 2493 (1958). Viewed in toto, the legislative history makes inescapable the conclusion that Congress intended to give officers retired before the effective date the six percent cost-of-living increase, and no more. See Fagan v. United States, 149 Ct. Cl. 716, 732, 277 F. 2d 469, 478-479 (1960). And this is completely consistent with the announced purpose of the legislation. Congress wanted to upgrade the quality of career cadres. This purpose would not have been served by allowing persons already retired to benefit from the basic pay increase. Congress also wanted everyone to get a cost-of-living increase. This purpose was served by section 4(a) as to persons already retired. It is true, of course, that retirement is an important part of the overall incentive package for officers of the uniformed services, and that the 1958 bill would not provide as great an incentive without an increase in retirement pay commensurate with the basic pay increase. Congress evidently perceived this, because in subsections (b) and (c) of section 4 it extended to persons retiring on or after the effective date the benefits of the 1958 basic pay rates.
The post-enactment history rounds out the picture. In 1963, the Uniformed Services Pay Act was enacted to provide additional incentives to career servicemen. 77 Stat. 210. Another purpose was “to establish a more equitable basis for the adjustment of retired pay for service members after retirement.” S. Rep. No. 387, 88th Cong., 1st Sess. (1963); U.S. Code Cong. & Ad. News 912 (1963). The House bill provided that persons who had retired prior to June 1,1958 should be able to prospectively recompute retired pay under the 1958 pay scales and added to that a five percent cost-of-living increase. The Senate Committee on Armed Services recommended an amendment that limited the retired pay increase to the higher of the recomputed figure or the five percent. U.S. Code Cong. & Ad. News 914 (1963). The House receded, so the Senate amendment became the law. Section 5, 77 Stat. 210, 212-215. In proposing the amendment, the Committee reviewed the philosophy of using cost-of-living *559 increases as the standard for retired pay increases, and noted that henceforth — after giving persons such as plaintiffs the “one-shot” opportunity to recompute on the 1958 active duty basic pay scales — retired pay increases would be geared solely to cost-of-living increases. Following is the Committee’s commentary on the amendment:
The 1958 Pay Act adopted the cost-of-living philosophy for retired pay increases in order to avoid extreme increases for some retired persons and little or no increases for others retired. It was the intent of this act that the element of cost of living should be the dominant consideration in authorizing retired pay increases. In order to reflect the increases in the cost of living which are applicable to all persons on the retired list, the percentage increase should be the same. The 1958 act granted a flat 6-percent increase to all retired persons except a 16- and 26-percent increase for those in three- and four-star rank, respectively. The higher percentage for these two grades was to permit the active duty supplement to be used for retired pay purposes.
Prior to 1958 the various pay acts permitted recompu-tation for those on the retired list in accordance with the newly enacted pay scales. Had this custom been continued in 1958, the higher ranking officers in the grades of lieutenant colonel and up would have received substantially larger increases than the 6-percent cost of living authorized. In order to provide a transition for those retired in the higher grades from the recomputation to the cost-of-living system, the committee does authorize recomputation under the 1958 scales. At the same time, these increases, ranging up to 45 percent over present retired pay and 74 percent over pre-1958 retired pay, appear ample as a transition provision.
There is the argument that recomputation plus 5 percent for this group would permit all persons (except those receiving pay under the old laws) to receive the same retired pay prior to the 1963 rates.
It should be observed, however, that there will be different rates of retired pay for persons of the same rank and service as a result of each new pay act. Implicit in the cost of living philosophy is the premise that a person’s retired pay will be based on the active duty rate whenever he retired, to be increased thereafter in accordance with increases in the cost of living. In the future since persons will be retiring under different pay *560 scales they will not receive initial retired pay of eqnal amounts. The action of the committee, therefore, is consistent with the cost-of-living philosophy in authorizing the minimum cost-of-living increase. In addition, it permits amounts above the cost-of-living increase as transition rates for the higher ranking officers who would have benefited more under recomputation in 1958. This provision also recognizes that, as in other retired systems, there will be a difference in retired pay rates with each pay act. [U.S. Code Cong. & Ad. News 932-933 (1963).]
Plaintiffs would have us disregard the legislative history or look to other history which includes statements in Congress. We do not agree that the words of the 1958 statute are so clear as to warrant disregarding the history. Furthermore, we think that the 1958 committee reports are the most reliable guide to Congressional intent in this case.[2] They are quite complete and make clear, at least to us, what Congress was trying to accomplish.
Plaintiffs’ best argument is that until the enactment of the 1963 legislation the scheme under which they received retired-pay-based-on-active-duty-pay before June 1, 1958 remained in Title 10 of the United States Code. The 1958 legislation made certain amendments to these sections in Title 10, indicating that Congress was aivare of the apparent continuance of the prior scheme. See, e.g., Act of May 20, 1958, §§ 6, 11, 72 Stat. 122, 129-132 (1958). Reference to the new legislation was made in notes following 37 U.S.C. § 232 (1958 Ed.) and 10 U.S.C. § 1401 (1958 Ed.), but nowhere was there an express repeal of the Title 10 provisions. We do not know why Congress waited until 1963 to remove from the Code these Title 10 provisions. We think, however, that the 1958 legislation leaves no doubt that sections 3 and 4 governed plaintiffs’ retirement pay. Both sections 3(a) and 4(b) start with the clause: “Notwithstanding any other provision of law * * and that means, notwithstanding the provisions in Title 10.
*561 Plaintiffs have also argued that their contract rights have been breached.[3] In the related case of Andrews, et al v. United States, post, p. 561, also announced today, we hold that similarly situated plaintiffs have no vested or contractual right which entities them to recovery.
Plaintiffs received a six percent increase in 1958, and a substantial increase in 1963. The statute gives them no more. Plaintiffs’ motion for summary judgment is denied. Defendant’s motion to dismiss is granted, and plaintiffs’ petitions are dismissed.

 There is no question that the exception contained in section 4(a) applies to plaintiffs if section 4(b) does not. Section 4(a) entitles all members of the uniformed services who were receiving retired pay “on the day before the effective date of this Act * * * to an increase of 6 per centum of that pay to which they were entitled on that date.” Plaintiffs received a six percent increase in retired pay under this Section' from June 1, 1958' to October 1, 1963, and claim the difference betweeh this and what they would have received under section 4(b).

 we have quoted the 1963 Committee Report only to show what Congress in 1963 thought was the intent of Congress in 1958.

 Plaintiffs do not expressly argue, as do the plaintiffs in Andrewsj that this alleged “denial of earned rights” contravenes their Fifth Amendment rights. Their argument seems to be that where there is ambiguity, a statute should not be read in a manner that “confiscates earned rights.”