Arnold CORNMAN

v.

The UNITED STATES.

No. 125–68.

United States Court of Claims.

April 11, 1969.

———◆———

Herbert D. Sturman, Beverly Hills, Cal., for plaintiff, Sherman & Sturman, Beverly Hills, Cal., of counsel.

Katherine H. Johnson, Washington, D. C., with whom was Asst. Atty., Gen., William D. Ruckelshaus, for defendant.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Before COWEN, Chief Judge, REED, Justice (Ret.), LARAMORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

REED, Justice (Ret.), sitting by designation.

■ The sole issue in this case concerns the meaning of the words "in any case" as they refer to a limitation on the amount of compensation payable to informers under the Tariff Act of 1930 (46 Stat. 758, as amended, 49 Stat. 527). The specific informers' compensation section involved here, 19 U.S.C. § 1619, provides "a compensation of 25 per centum of the net amount recovered, but not to exceed $50,000 in any case," for any person furnishing "original information" on customs law violations that "leads" to a recovery of a fine, penalty, or duties withheld. As a result of plaintiff's disclosure of asserted improper invoice practices on the part of a number of Japanese steel companies in violation of 19 U.S.C. § 1592,[1] the Government recovered an aggregate amount of some $700,000 from those companies in unpaid duties and penalties. The precise question facing us is whether the words "in any case" refer to the service of furnishing the false invoicing information, as the Government contends, limiting plaintiff's compensation to $50,000, or whether they refer to each individual recovery from each company for each individual violation, as plaintiff contends, allowing him to compute the statutory maximum separately for each company involved.

The facts are simple and undisputed. In late August 1964, a Treasury Department official approached the plaintiff in Los Angeles and asked him to furnish original information relative to various cases of customs law violations by various Japanese trading companies. After several subsequent discussions with the official, plaintiff accompanied him from Los Angeles to Washington for meetings with an Assistant Secretary of the Treasury and other Treasury officials. Thereafter, plaintiff disclosed detailed information about the false invoicing practices of several Japanese steel companies. Although there is nothing in the record to show the exact manner of invoicing employed by the companies or whether the same method was used uniformly throughout the industry, the practices all involved violation of the same statute. 19 U.S.C. § 1592. As a result of plaintiff's information and a subsequent settlement with the importers, the Government recovered a total of $706,965.00 in fines and un-

---

1. 1592. Penalty against goods.—If any consignor, seller, owner, importer, consignee, agent, or other person or persons enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or makes any false statement in any declaration under the provisions of section [485 of this Act] 1485 of this title (relating to declaration on entry) without reasonable cause to believe the truth of such statement, or aids or procures the making of any such false statement as to any matter material thereto without rea-sonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement; or is guilty of any willful act or omission by means whereof the United States is or may be deprived of the lawful duties or any portion thereof accruing upon the merchandise or any portion thereof, embraced or referred to in such invoice, declaration, affidavit, letter, paper, or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from such person or persons, shall be subject to forfeiture, * * * *"

paid duties from 19 companies. The various amounts making up this figure ranged in size from a recovery of $302,-380 from one large producer to $120 from a much smaller one.

The statute under which plaintiff then claimed his informer's fee, 19 U.S.C. § 1619, reads in part as follows:

> Any person not an officer of the United States who * * * furnishes to * * * the Secretary of the Treasury, * * * original information concerning any fraud upon the customs revenue, * * * which * * * information leads to a recovery of any duties withheld, or of any fine, penalty, or forfeiture incurred, may be awarded and paid by the Secretary of the Treasury a compensation of 25 per centum of the net amount recovered, but not to exceed $50,000 in any case. * * *

There have been no judicial decisions construing the critical statutory language involved here, and the existing legislative history and administrative interpretation can be briefly summarized. The original informers' compensation statute dates back to the Act of June 22, 1874 (18 Stat. 186), which provided that "such compensation may, on such recovery [of any withheld duties], be paid to such person so furnishing [original] information [concerning any customs fraud] as shall be just and reasonable, *not exceeding in any case the sum of five thousand dollars.*" (Emphasis added.) The exact wording of the present statute was not introduced until 1922, in the Tariff Act of 1922 (42 Stat. 988), which repealed the 1874 Act in section 643 and provided the following in section 619:

> Any person * * * who furnishes * * * original information concerning any fraud upon the customs revenue, * * * which * * * information leads to a recovery of any duties withheld, * * * may be awarded * * * *a compensation of 25 per centum of the net amount recovered, but not to exceed $50,000 in*

*any case,* which shall be paid out of moneys appropriated for that purpose. (Emphasis added.)

The original House version of the bill (H.R. 7456) had simply readopted the language of the 1874 Act for section 619 of the 1922 Act, and the Senate amendment providing the precise language, above, that was eventually enacted and persists to the present day, was explained by the Conference report as follows:

> The House bill limited the compensation to be paid the informers in fraud cases to $5,000. The Senate amendment provides a compensation of 25 per cent of the net amount recovered but not more than $50,000, in order to recover greater amounts in these cases. (H.Rep. 1207, 67th Cong., 2d Sess. 1922).

Administrative processing of large claims such as the one involved here has been based on a 1917 decision of the Comptroller of the Treasury dealing with a similar fact situation of original information leading to multiple recoveries from separate companies, and interpreting the language of the 1874 Act. That decision (24 Comp.Treas. 17) held that:

> Under the act of June 22, 1874, prescribing the payment of compensation, not exceeding in any case the sum of $5,000, to persons giving original information of customs frauds, which information shall lead to the recovery of withheld duties, the term "in any case" has reference to the total payment for the service rendered, regardless of the number and value of the recoveries effected thereunder.

In holding that the term "in any case" had reference "to the information furnished, rather than to the recoveries," the Comptroller pointed out the incongruity and injustice of allowing an informer who disclosed a single $100,000 recovery only $5,000 in compensation, while allowing an informer whose information leads to five $20,000 recoveries as much as $25,000. "It was clearly the

intent of the law," the Comptroller said, "to fix a maximum compensation to be paid for any such service" of furnishing information.

According to an uncontroverted affidavit submitted by the Government from a customs official who has participated in a majority of section 619 compensation awards since 1930, the Bureau of Customs has "consistently followed and applied this 1917 administrative" ruling in the rare instances where this unusual question has arisen. Plaintiff's claim was so handled here, of course, as he was sent a copy of the 1917 ruling in response to his request for additional compensation. In 33 Treas.Dec. 51 (1917), the Assistant Secretary of the Treasury quoted from the Comptroller's decision and directed all officials concerned to follow it in making awards. In the affidavit, the official states that there have been no later decisions revoking or amending these instructions.

■ The instant litigation arose following the Government's award of $50,-000 to the plaintiff and his subsequent, unsuccessful attempts to have the compensation computed individually for each company involved. After receiving a copy of the Treasury ruling referred to above from the Government in answer to his second demand for additional compensation, plaintiff filed this petition claiming that he was entitled to a sum of $101,146.25 over and above the original $50,000. The total amount plaintiff claimed he was entitled to—$151,146.25 —was arrived at by taking $50,000 with respect to any one recovery exceeding $200,000, and 25% of the remaining amounts. There being no disputed issues of fact, both parties moved for summary judgment after the opening briefs were filed. For reasons outlined more fully below, we grant the Government's cross-motion for summary judgment and dismissal of the petition.

■ At the outset, we start with the simple and well-accepted proposition that the construction of a statute by the administrative agency given the primary duty of executing it is entitled to great weight. To uphold the Secretary's application of the phrase "in any case," we need "not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."[2] The test of time adds strength to a conclusion previously arrived at:

> [T]he practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years will not be disturbed except for cogent reasons.[3]

Plaintiff's contention here, in the face of the 1917 Treasury ruling and the familiar principle noted above, is essentially threefold. He argues first that the plain meaning of the words gives rise to only one interpretation, and that the Treasury construction is clearly erroneous and therefore entitled to no respect. He argues secondly that even if the 1917 ruling was arguably a reasonable interpretation of the 1874 statute, the language of the compensation provision was changed so substantially in 1922 that the 1917 ruling is no longer applicable or controlling. Finally, plaintiff argues that the Treasury ruling will lead to such mischievous results that it ought not to be followed in this or similar cases. We must reject each of these contentions.

■ Plaintiff's first contention, that "in any case" can refer only to each recovery from each individual company for each violation, is premised essentially on the fact that the statute is written in the singular: the statute, he points out,

2. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964), quoting from Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

3. McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921).

speaks in terms of any "fraud," "fine," "penalty," "forfeiture," "amount recovered," and finally, "a compensation"—all in the singular. Therefore, he says, "case" must be read as referring, also in the singular, to any company or violator against whom the Government has any active "file," whether or not the "case" is actually litigated. Plaintiff's own analysis suggests two additional, reasonable interpretations, however: carried to its logical extreme, plaintiff's position could require breaking down the violations of each company into each separate shipment, or, short of that, could allow each economic unit to be treated separately but require parent-subsidiary groups to be considered as single units for purposes of the statute. (Three of the nineteen companies involved here are members of a parent-subsidiary control group.) Another possibility, of course, would be simply to give the words "in any case" their common, everyday meaning, i. e., "under any circumstances," "in all events," or "without regard to any other considerations." Given these possibilities, it is difficult to say that the statute has only one meaning, and that a fifth construction, made by the Treasury and viewing "case" as referring to the service of furnishing original information, is not "at least an admissible one."

■ Plaintiff argues secondly that the 1917 ruling should not be given continued respect in view of the changes in the statute in 1922. Plaintiff's position ignores the simple fact, however, that the 1917 ruling, which has never been rescinded, *has* been given continued respect, and as such can be viewed as a reinterpretation of the 1922 statute; in this respect, then, plaintiff is only rephrasing his first contention. It is worth pointing out in addition that the Conference Report cited above indicates that the Senate seems to have changed the language of the 1874 act solely for the purpose of increasing the ceiling of compensation amounts that could be awarded from $5,000 to $50,000. Indeed, the absence of any reference in that report to the critical words "in any case" belies any notion that Congress intended to change the method of computing the award and suggests that Congress, whether or not it was aware of the 1917 ruling, understood the enumerated dollar figures as establishing an absolute limit on the amount that could be paid informers for any particular original information, regardless of the number of instances to which it was applicable.

■ Plaintiff contends finally that there are convincing reasons for abandoning the Treasury approach, regardless of its validity as a matter of statutory construction. To fail to do so would, he urges, encourage informers to give out information on a piecemeal basis in order to obtain the maximum compensation, or not to give it out at all if there is no waiting reward. Plaintiff ignores the word "original," however, which must be read in conjunction with the "information" furnished. As the Government points out, had plaintiff leaked his information on a piecemeal basis, the Treasury might well have ruled on plaintiff's second disclosure and demand for compensation that since plaintiff's information involved the same thing—false invoicing practices in violation of 19 U.S.C. § 1592—his information was no longer "original" after the first disclosure. Such a disposition would not frustrate the operation of the statute, for the Government, after the routine instigation of independent investigations on the basis of the information initially furnished, would in all probability discover the same violations later reported.

The Government's motion for dismissal is sustained.

Plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted and the petition is dismissed.

COLLINS, Judge (dissenting):

I respectfully differ with the decision of the court on the ground that the language of 19 U.S.C. § 1619—the only re-

liable guide in this instance—demands, in my opinion, a contrary result.

The cornerstone of the court's opinion as I read it is the prior administrative construction of the statute. This construction would limit plaintiff to a $50,000 maximum reward for information given at any one time, irrespective of the number of companies or the number of violations involved. Under the doctrine of contemporaneous administrative construction, as the court holds, the agency's interpretive practice here is entitled to great respect and, apparently, presumptive validity. *See, e. g.,* Schellfeffer v. United States, 170 Ct.Cl. 178, 343 F.2d 936 (1965); H. B. Zachry Co. v. United States, 170 Ct.Cl. 115, 344 F. 2d 352 (1965). Although I completely accept the viability of this doctrine (*see* DeLano v. United States, 183 Ct.Cl. 379, 388, 393 F.2d 517, 521 (1968)), I do not believe this is an appropriate case for its application.

There are, it seems to me, two major reasons why the consistently maintained construction of a statute by the agency charged with its enforcement is given great weight by a court. First, as a particular reading of a statute is repeated and solidifies into doctrine, those whose activities are affected by the statute come to rely upon the given construction. 2 J. Sutherland, Statutory Construction 521 (3d ed. 1943). An analogous consideration is the judicial recognition (1) that the practical construction of the statute is an aid to determining the meaning of the act and (2) that adherence to that construction makes for certainty in the law and justifies reliance upon public officials. 2 J. Sutherland, *supra* at 513.

The second reason is the judicial deference paid to precedent. When an agency has been faced over a number of years with deciding a goodly number of factually dissimilar cases involving the same legal issue and has consistently reached the same result, the probability that the administrative construction is correct is far greater than it is when only a few isolated cases have been decided. The parallel to the comparative judicial treatment as authority of one or two cases in point, as distinguished from a long line of cases, is obvious.

In the instant case, only one administrative determination is cited to us, and that case was decided in 1917 under the predecessor of the current statute. We are told by affidavit that the policy expressed in that decision has been consistently maintained. Yet, defendant's counsel at oral argument admitted to knowing of only one or two subsequent applications of the rule, apparently in a purely executive fashion. Nothing in the affidavit is inconsistent with this statement. In light of the fact that the informer-compensation statute, in one form or another, has been in existence for nearly 100 years, I have great difficulty in according to so few isolated agency determinations the label of "consistent administrative practice."

In the first place, the agency has not been faced with a variety of factual situations involving the same issue. There has been no oft-repeated application of a well-known rule on a day-to-day, or even a year-to-year, basis. Apparently, there has been only one formal quasi-judicial consideration of the issue. It is therefore much truer to say that the policy has been consistently maintained in theory rather than in practice. Because of this limited application of the ruling in random instances scattered over a considerable period of time, it is difficult to see how those affected by the act can be said to have generally accepted and relied upon a "practical interpretation" of the law. *See* 2 J. Sutherland, *supra* at 515. There is no established line of administrative cases here, the overturning of which would create uncertainty in the law or destroy faith in public officials.

Because the instant administrative practice has not been consistently and repeatedly maintained within the meaning of the contemporaneous construction doctrine as I understand it, I would not

accord to the lone decision of the Comptroller any presumptive correctness. The administrative policy here is more properly treated simply as evidence bearing upon the meaning of the statute. However, as explained below, I believe that the agency interpretation tends to defeat the underlying purposes of the statute and is accordingly less than reasonable. *See* Henneberger v. United States, 185 Ct.Cl. 614, 627–628, 403 F.2d 237, 244 (1968) (dissenting opinion); Tasker v. United States, 178 Ct.Cl. 56 (1967).[1]

The court also attempts to find a resolution of the statute's possible ambiguity in the legislative history, a clearly proper investigation. Akerson v. United States, 175 Ct.Cl. 551, cert. denied, 385 U.S. 946, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966); Thermo King Corp. v. United States, 173 Ct.Cl. 860, 354 F.2d 242 (1965). The court interprets the portion it quotes of H.R.Rep. No. 1207 as indicating that Congress intended the change from $5,000 to $50,000 to establish an absolute limit. However, because it is at least clear that the limit has always been absolute as applied to any one violation, the report could also be read just as easily as evidencing an intent to increase the limit on an informer's compensation for reporting each violation, as distinguished from several violations by several companies. Where the legislative history itself is ambiguous, it is at best hazardous to rely upon it to govern judicial construction of a statute. *See* United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 348–349, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Crawford v. United States, 179 Ct.Cl.

128, 144, 376 F.2d 266, 275 (1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968). Unfortunately, the language and legislative history of the other Federal informer statutes is likewise unhelpful.

Therefore, it is in the statute itself that we must find its meaning. As the court notes, the statute's terms are written in the singular. However, because of the variety of possible meanings of the statutory phrase "in any case" and relying on the administrative ruling, the court declines to accept plaintiff's reading of the statute.

In the first place, it seems to me that the meaning of the word "case" is an issue secondary to the resolution of whether recovery can be had in *each* "case," whatever the term means. Defendant argues that the phrase "in any case" is the common colloquialism meaning "under any circumstances" or "in any event," such that the $50,000 limitation would apply to the total informer service rendered, irrespective of other considerations.

Even assuming that defendant's interpretation of the phrase is correct, it by no means follows that the limitation was intended to apply to the *total* recovery. No language in the statute supports this conclusion. On the contrary, when the statute is read as a whole, as is proper (*see* Jamerson v. United States, 185 Ct. Cl. 471, 475, 401 F.2d 808, 810 (1968); *cf.* General Motors Corp. v. United States, 151 Ct.Cl. 366, 370, 283 F.2d 699, 701 (1960)), the phrase "in any case" must be viewed as referring to, modifying, and being modified by the *singular*

---

[1]. I do not understand the court to rely upon the principle that subsequent reenactment of a statute with congressional knowledge of the administrative practice is an implied ratification of such practice. *See* DeLano v. United States, 183 Ct.Cl. 379, 393 F.2d 517 (1968); Ware Knitters, Inc. v. United States, 144 Ct. Cl. 141, 168 F.Supp. 208 (1958). There is no evidence here that Congress knew of the Comptroller's decision when it reenacted the instant statute. Moreover, this court has been rightly hesitant to fully re-

ly upon the implied-ratification doctrine in the absence of a clear showing of congressional awareness of the agency practice. *See* Fox v. United States, 145 Ct.Cl. 186, 188, cert. denied, 361 U.S. 887, 80 S.Ct. 160, 4 L.Ed.2d 122 (1959); Ware Knitters, Inc. v. United States, *supra*; *cf.* A. P. Green Export Co. v. United States, 151 Ct.Cl. 628, 284 F.2d 383 (1960). *But cf.* Crawford v. United States, 179 Ct.Cl. 128, 376 F.2d 266 (1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968).

fine, penalty, or other recovery described. Plaintiff readily admits—in fact argues—that the $50,000 limitation does apply to the recovery for any one violation.

The court otherwise refuses to accept plaintiff's reading of the statute in the singular primarily because of the administrative ruling previously mentioned. As stated above, I would not attribute to the agency's policy more than indicative weight. If my position on this point is accepted, it seems to me that plaintiff's construction of the specific language of the statute is more plausible than and outweighs the agency's interpretation.

Whether the limitation applies to the individual recovery for each violation or to the total amount recovered for all violations simultaneously reported remains in question. As mentioned above, I see nothing in the statute to indicate that the limitation applies to the entire recovery, as the court suggests. On the other hand, the singular language of the statute clearly tends to substantiate plaintiff's argument. Logically, however, as the court recognizes, each particular shipment could be broken down into its components. However, in actuality, each illegal shipment as a whole would constitute one violation, in the same way that the simultaneous theft of 1,000 individual dollars would constitute one count of larceny. The fine, penalty, or duties contemplated by the statute are assessed by virtue of each violation. Accordingly, plaintiff could conceivably seek 25 percent of each recovery for each violation by each of the several companies here involved, subject always to the limitation applied to each such recovery and the prerequisite of originality.

However, in recognition of the administrative treatment of the violations of one company as one case file, plaintiff seeks only 25 percent of the total recovery from each company, not to exceed $50,000 in any instance. In my opinion, plaintiff's construction of "case" in this fashion, even if less generous than the statute contemplates, is nonetheless entirely consistent with the other terms of the statute, and I would find for plaintiff despite problems which might arise in other cases regarding the meaning of "company."

It is eminently clear that 19 U.S.C. § 1619 is designed to encourage the disclosure of customs violations to enable the Government to recover at least a portion of the duties it would otherwise lose. The statute must be construed to best effectuate this policy. The court's decision, in my opinion, could seriously thwart the congressional aim. As a practical matter, someone who has knowledge of extensive customs violations is not likely to gratuitously give the Government more original information than necessary to recover the maximum allowed by the court's ruling.[2] To do so would be to expose himself to the wrath and, in some cases, retribution of those against whom he has informed without any offsetting compensation. The court's apparent belief that its decision will not seriously affect the receipt of information is, in my opinion, unrealistic.

There is one further reason why I believe the majority opinion and the administrative ruling are incorrect. I assume that no one would seriously dispute that an informer who gave information for which he received $50,000 on one occasion, and who later returned with original information regarding entirely different violations by other persons, would not be precluded by virtue of his first recovery from receiving his fee for the later information. Why then should an informant be limited to only $50,000 if he is in a position to give

---

2. Once the informer has met the prerequisites of the statute, the Secretary is without discretion to refuse to pay the appropriate amount. Wilson v. United States, 135 F.2d 1005 (3d Cir. 1943); Tyson v. United States, 91 Ct.Cl. 139, 32 F.Supp. 135 (1940).

at one time the same distinct original information about separate violators? The only variable in the two hypotheticals is the time factor. I see no justification in the statute for distinguishing between the two cases.

Accordingly, I would grant plaintiff the relief sought.