**WHITE & CASE LLP, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–2800C.**

United States Court of Federal Claims.

Filed under seal Aug. 7, 2009.

Reissued Sept. 3, 2009.[1]

1. Because the opinion may have contained information which is subject to the protective order issued in this case, the parties were given the opportunity to request redactions. One request was proposed by defendant, without opposition, and has been incorporated in footnote 5. The opinion is reissued for publication with some minor, non-substantive corrections.

**14**

Lucius B. Lau, White & Case LLP, Washington, D.C., for plaintiff.

Sean M. Dunn, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Gregory G. Katsas, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, all of Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

The motions presently before the Court in this matter concern the interpretation of the words "any case," as these are used in the provision which limits the amount of compensation that may be paid to informers under the moiety statute, 19 U.S.C. § 1619(c). Plaintiff White & Case LLP alleges that it provided original information regarding ninety-eight separate invoices (or other documents related to shipments) which were fraudulent and violated customs laws, and argues that each violation should be considered a separate case for purposes of the $250,000 compensation ceiling. United States Customs and Border Protection ("Customs") issued an opinion determining that White & Case's moiety applications involved just one case for purposes of the ceiling, since the violations concerned the same commodity exported from the same country and were considered by Customs to be the subject of one investigation. As explained below, the Court concludes that neither party is correct in its interpretation of the relevant statute, and accordingly denies both plaintiff's motion for partial judgment and defendant's cross-motion for judgment on the administrative record. The Court also finds that the matter is ripe for review, and denies the government's motion to dismiss the case.

### I. BACKGROUND

In 1997, the United States Department of Commerce issued an antidumping duty order, which imposed a 43.32% duty on imports of brake rotors produced by certain companies from the People's Republic of China. See Notice of Antidumping Duty Order, 62 Fed.Reg. 18,740 (April 17, 1997). Several combinations of Chinese producers and exporters were excluded from the order and thus subject to no antidumping duty, including when brake rotors produced by Shandong Laizhou CAPCO Industry Co. ("Laizhou CAPCO") were exported by either China National Automotive Industry Import & Export Corporation ("CAIEC") or Laizhou CAPCO. See id. at 18,741. Laizhou

CAPCO and CAIEC were clients of White & Case.

In March and April 1998, an importer and a representative of CAIEC each wrote letters to Customs accusing another importer of having evaded paying the antidumping duties by falsely claiming that its brake rotors were excluded items exported by CAIEC. Admin. Rec. ("AR") at 1, 3, 318–19. The leads were investigated and could not be substantiated, and the "case was closed" on June 26, 1998. *Id.* at 2. By June 1999, the Los Angeles Strategic Trade Center of Customs ("LA STC") concluded that, despite suspicions that importers were evading paying the antidumping duties, "the top ports found no evidence of" false statements or fraud. *Id.; see also id.* at 333. But shortly before this time, one of White & Case's clients learned of a March 1999 bill of lading for a shipment of brake rotors to New York that falsely identified Laizhou CAPCO as the exporter. *See id.* at 320–22. One of plaintiff's attorneys telephoned Customs in May 1999 to inform it of the false document and discuss a coding system that CAIEC and Laizhou CAPCO could implement to enable Customs to tell false from genuine shipments. *See id.* at 320–21; Answer ¶ 15. This discussion was followed by a letter from White & Case to Customs, dated June 1, 1999, which explained the code—consisting of two letters and seven-digit numbers that would always add up to the same sum—which would be added to the invoices and bills of lading of CAIEC and Laizhou CAPCO brake rotor shipments, beginning that day. AR at 320–21. Sample documents bearing the code were included. *Id.* at 323–26.

The next day, Customs posted a confidential message to port directors and other personnel, using an electronic bulletin board, explaining the special code and informing them that CAIEC or Laizhou CAPCO shipments lacking the code should be considered fraudulent and subject to the 43.32% antidumping rate. *See* Attach. to Def.'s Not. of Filing (Nov. 14, 2005) ("Admin.Dec.") at 2;

AR at 327.[2] On June 10, 1999, plaintiff sent a letter to a Customs official in New York to draw attention to the fraudulent March 1999 bill of lading, and to alert Customs that an importer requested from Laizhou CAPCO a copy of a bill of lading for two containers of brake rotors entering through Los Angeles which were not, in fact, shipped or sold by this company. AR at 312–17. The letter identified the two containers by entry number, *see id.* at 313, and was followed the next day by another letter, sent by facsimile to the same Customs official, which corrected the name of the importer and provided more information concerning the shipment. *See id.* at 305. The LA STC subsequently looked into the two invoices, and determined one was "non-genuine" and the other was "questionable" as it understated the value of the goods by approximately $400. *Id.* at 331. The LA STC had previously discovered the confidential bulletin explaining the special code placed on genuine documentation from White & Case's two clients, and decided to conduct an "intervention" to determine the extent of antidumping duty evasion at major ports. *Id.* at 333–34; Admin. Dec. at 3 (finding that the bulletin about the code "triggered" a "five-port investigation"). In its September and October 1999 training of port officials participating in the intervention, which was to be launched October 18, 1999, the LA STC included plaintiff's coding system. AR at 330.

On October 14, 1999, LA Customs officers called White & Case to discuss the coding system and plaintiff's ability to have invoices verified by its clients. *Id.; see also* Admin. Dec. at 2. Plaintiff wrote back later that day, confirming that a particular invoice was not genuine, and identifying the only U.S. distributors of brake rotors exported by its clients in 1999. AR at 138. White & Case also confirmed that the coding system was implemented June 1, 1999, and informed Customs that CAIEC and Laizhou CAPCO would be asked to compile lists of all genuine shipments to the U.S. dating from the first of

---

**2.** At that time, Customs was known as the United States Customs Service, and was still part of the Department of the Treasury. In 2003, it was transferred to the Department of Homeland Security ("DHS"), *see* 6 U.S.C. §§ 203, 211, and its investigative agents became part of DHS's Immigration and Customs Enforcement. *See* Admin. Dec. at 2 n. 1. For our purposes the reorganization is immaterial, and the opinion will refer to "Customs" throughout.

the year. AR 139. These lists of genuine brake rotor exports were sent to Customs by facsimile on November 8, 1999, and identified all shipments from January 1 through October 27, 1999 by invoice number and customer, and for most shipments also included shipping dates and bill of lading numbers. *See id.* at 109–17. In a letter sent to Customs on November 9, 1999, White & Case explained that with the shipping lists and the coding system, "Customs now has a full-proof system to identify all shipments from January 1, 1999 onwards that were falsely declared as being shipments from Laizhou CAPCO or CAIEC." *Id.* at 110. Plaintiff offered to verify "in short order" whether any particular shipment was genuine, *id.*, and also clarified that there were more importers of the genuine articles than were identified in the October 14 letter. *Id.* at 109 n. 1.

Before the comprehensive lists were sent to Customs, on October 25, 1999 White & Case was asked by a New York Customs investigator to confirm whether three invoices were genuine, and the next day reported they were not. *Id.* at 131. The following week, White & Case responded to a request from the same official and determined that two invoices were falsely identified as shipments of brake rotors from another Chinese client subject to a zero antidumping duty rate, China National Industrial Machinery Import and Export Company ("CNIM"). AR at 119–20.[3] Two days after the comprehensive lists were sent, on November 10, 1999, plaintiff responded to a request from a New York Customs official, verifying that a particular invoice was not genuine based on its lack of the special code and its non-inclusion on the shipment lists. *Id.* at 76–77. The following week, on November 16, 1999, plaintiff reported to an LA Customs official that its clients had confirmed that a particular invoice, lacking the code and absent from the comprehensive lists, was indeed not genuine. *Id.* at 74–75.

Throughout the next two months, White & Case responded to numerous requests from the LA Customs official to verify that specific invoices were not genuine. These requests usually came in the form of e-mails sent to the White & Case attorney who initially contacted Customs. The record contains at least twelve e-mails or faxes, sent on eleven separate days, requesting confirmation that 85 different invoices were not genuinely from Laizhou CAPCO or CAIEC. *See* AR at 69, 163–65, 170–71, 175, 177, 189, 195–96, 204 (requests dated November 17 and 24, and December 1, 7, 9, 10, 14, 15, 20, and 21(two)); Attach. 2 to Pl.'s Mot. to Supp. Admin. R. (December 28, 1999).[4] White & Case confirmed that not one of the 85 invoices were genuine. *See* AR at 16, 19, 20, 23, 57, 63, 66, 70.[5] While the vast majority of these invoices apparently bore a 1999 date, and thus could have been confirmed fraudulent on the basis of either lacking the special code, not being on the comprehensive lists, or both, as many as twenty either predated 1999 or had an ambiguous date. *See id.* at 189, 195–96.

In addition, three e-mails requested confirmation regarding invoices purported to be from other clients of White & Case that were either excluded from the antidumping duty order or had zero deposit rates. *See id.* at 173 (Laizhou Luyuan Automobile Fittings Co.), 174 (CNIM), 203 (China National Machinery and Equipment Import & Export (Xinjiang) Co. and Zibo Botai Manufacturing Co.). One request does not appear to have been answered, *see id.* at 154, one invoice was verified as legitimate, *id.* at 197, and three invoices were confirmed as falsely claiming CNIM was their source. *See id.* at 20, 53.[6] At the time, plaintiff represented all

---

**3.** The invoice apparently declared the items as having been shipped by CNIM's parent company, which neither exported brake rotors to the U.S. nor qualified for the zero rate. *See* AR at 119. The Complaint erroneously alleges that plaintiff verified that these invoices were not genuinely CAIEC's or Laizhou CAPCO's, rather than CNIM's. *See* Compl. ¶¶ 47, 50.

**4.** The December 28 e-mail also inquired about two invoices which were identified as coming

from another of plaintiff's clients, Laizhou Auto Brake Equipments Factory. *See also* AR at 190 (list of plaintiff's Chinese brake rotor clients).

**5.** One of these invoices, "[XXXXXX]," dated March 22, 1999, *see* AR at 57, 189, is not specifically enumerated in the Complaint.

**6.** Two of the three false CNIM invoices were included as counts in the Complaint, but were

eighteen Chinese brake rotor producers or exporters which were either excluded from the order or had a zero antidumping duty rate. *See* AR at 59, 186–87, 190–91, 330. On November 10, 1999, White & Case wrote to Customs on behalf of one of these exporters, identifying a special code that would be placed on their invoices and bills of lading. *Id.* at 79–80. One week later, White & Case sent an e-mail to the LA Customs official which described several of its other clients as "much bigger players in the market" than CAIEC and Laizhou CAPCO, and thus likely to be falsely identified as producers or exporters on invoices used by antidumping duty evaders. *Id.* at 206. Plaintiff offered to obtain shipment lists or have a code system adopted for these other clients, and one of its lawyers stated he "would be happy to come to Los Angeles to meet with [the Customs intervention] team and present all this information together, which is preferable than the piecemeal approach so far." *Id.* On December 6, 1999, White & Case responded to a New York Customs official's inquiry to confirm that a letter concerning a brake rotor shipment, purportedly sent to Customs from CAIEC, was fake and did not concern a shipment by that company. *Id.* at 61, 194. And on December 13, 1999, White & Case wrote to the LA Customs official to inform her of an invoice dated September 22, 1998, which its clients believed was falsely declared as shipped by CAIEC or Laizhou CAPCO. *Id.* at 54–55.

Plaintiff submitted to the Terminal Island, California office of Customs, on January 4, 2000, a claim for informant compensation under 19 U.S.C. § 1619 and 19 C.F.R. § 161.16. AR at 6–217. White & Case sought a moiety for having provided original information which identified ninety-eight fraudulent brake rotor shipments. *See id.* at 10–13. After not receiving a decision on its claim for more than one year after it was filed, a second claim for informant compensation, based on the same fraudulent shipments, was submitted on May 30, 2001, this time to the New York office of Customs. *Id.* at 218–317. More than two years later, with still no decision from Customs, White & Case filed its Complaint in our Court on December 10, 2003. *See* Compl. Plaintiff seeks a moiety of 25% of the net amount of duties, fines, forfeitures, and penalties recovered by Customs relating to the fraudulent shipments identified through original information furnished by White & Case. Compl. ¶ 23; *id.* at 52. In addition to ninety-eight separate counts seeking informer's compensation, each corresponding to a fraudulent shipment of brake rotors, plaintiff included a count requesting an accounting of all amounts recovered as a result of the original information it provided to Customs. Compl. ¶¶ 322–28.[7]

The government moved to dismiss the case, arguing that White & Case had failed to exhaust administrative remedies and did not present a case that was ripe for review, as the moiety applications had not yet been acted upon by Customs. *See White & Case LLP v. United States,* 67 Fed.Cl. 164, 167–68 (2005). The motion was denied. *Id.* at 176. The Court concluded that the informer compensation statute did not require that administrative remedies be exhausted, and determined that, as a prudential matter, the prejudice to the plaintiff due to the lack of any set time frames for Customs to act on moiety applications outweighed the institutional interests of the latter. *Id.* at 169–71. Regarding the ripeness argument, the Complaint on its face alleged that each fraudulent invoice was the basis of a separate claim for relief, and that original information provided by plaintiff regarding customs law violations led to recoveries for each entry. The Court concluded that the matter was fit for review, to the extent that claims were fully liquidated. *Id.* at 172–74. The government's litigation position was that the matter was not ripe because, for purposes of the moiety statute, each count was part of one larger case which would not ripen until all

erroneously identified with CAIEC and Laizhou CAPCO. *See* Compl. ¶¶ 230, 233.

7. Defendant contends that only ninety-three separate and identified entries are contained in the Complaint, asserting that three counts are dupli-

cative of others, one was unknown, and the one regarding the fake letter sent to the New York Customs office was not associated with any Customs action. *See* Adm. Dec. at 3 n. 2; Attach. to *id.* at 2–3.

collection activities related to the brake rotors intervention were completed. *See id.* at 173. The Court stayed the matter to give Customs the opportunity to determine the size of the moiety payments to which White & Case was entitled, and to allow it to make a formal determination of the number of cases presented for purposes of the 19 U.S.C. § 1619(c) award ceiling. *Id.* at 171, 176.

On November 14, 2005, Todd J. Schneider, an official with the Penalties Branch of Customs' Office of Regulations and Rulings issued an opinion concerning plaintiff's moiety claims. Admin. Dec. at 1–6.[8] Customs found that plaintiff "provided original information to the agency involving a scheme to circumvent antidumping laws covering Chinese brake rotors that resulted in a five-port investigation." *Id.* at 5. But although the White & Case "original information led to the triggering of the five-port investigation," *id.* at 3, and thus to the detection of all of the fraudulent shipments described in the moiety claims and the Complaint, Customs determined that an award could not be made before its investigation and all collections related to the intervention were completed. *Id.* at 4–6. In Customs' opinion, all of these violations are part of one case, as plaintiff provided "information about a single scheme to avoid antidumping duties," which "involved the same commodity, brake rotors, exported from the same country, [the People's Republic of China], within the same time period." *Id.* at 3.

## II. DISCUSSION

White & Case has moved, under what was then Rule 56.1 of the Rules of the United States Court of Federal Claims ("RCFC"),[9] for partial judgment based on the administrative record, seeking the determination that each one of the ninety-eight violations identified in the Complaint is a separate case for purposes of the $250,000 ceiling on moiety awards. *See* Pl.'s Mot. for Partial Sum.

J. at 1; Pl.'s Mem. in Supp. of its Mot. for Partial Sum J. ("Pl.'s Br.") at 19. The government has cross-moved for judgment on the administrative record, arguing that Customs' determination that only one case is involved should be upheld. *See* Def.'s Resp. to Pl.'s Mot. for Partial Sum. J. ("Def.'s Br.") at 19. The government also renewed its motion to dismiss the case for failure to state a claim upon which relief can be granted, under RCFC 12(b)(6), contending the case is not ripe until the brake rotor investigation is completed and the agency determines the size of the resulting informer's award. *See id.* at 28–30.

### A. Standard of Review

 A motion for judgment on the administrative record under RCFC 52.1 differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1355–57 (Fed.Cir.2005); *Fort Carson Supp. Servs. v. United States,* 71 Fed.Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson,* 71 Fed.Cl. at 585; *Greene v. United States,* 65 Fed.Cl. 375, 382 (2005); *Arch Chemicals, Inc. v. United States,* 64 Fed.Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the Court] were conducting a trial on the record." *Bannum,* 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States,* 86 Fed.Cl. 325, 337 (2009); *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 350 (2004).

 As Customs has determined not to pay a moiety to plaintiff at this time, based on the agency's conclusion that only one, on-

---

8. The Administrative Record was also filed that same day.

9. The Court's rule concerning judgments on an administrative record has since been moved to RCFC 52. 1, and re-styled. The substantive law

to be applied under the rule has not changed, *see Court Rules,* 72 Fed. Cl. xiii, xvi (2006) (Rules Committee Note), and the opinion will henceforth refer to the motions as having been brought under the current RCFC 52.1.

going case is presented in the claim filed by plaintiff, plaintiff's challenge to this determination is essentially an allegation that the agency "has improperly withheld an award." *Doe v. United States,* 100 F.3d 1576, 1583 (Fed.Cir.1996). Under the legal standard for review of such decisions, the decision "will be upheld unless it is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, procedurally defective, or unsupported by evidence in the record." *Id.* (citing *Tyson v. United States,* 91 Ct.Cl. 139, 141–44, 32 F.Supp. 135 (1940)). A decision may be overturned when it is found to have been based on "an incorrect interpretation of the applicable law," *id.,* as "the right to determine questions of law ... is the exclusive province of the courts." *Tyson,* 91 Ct.Cl. at 143, 32 F.Supp. 135.

■■■■ The dismissal of a complaint for failure to state a claim upon which relief can be granted is governed by RCFC 12(b)(6). When considering such a motion to dismiss, a court accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1326 (Fed.Cir.2002); *Englewood Terrace Ltd. P'ship v. United States,* 61 Fed. Cl. 583, 584 (2004). The granting of a motion to dismiss for failure to state a claim "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002); *see also Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir. 2000). The motion will be denied when the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

## B. What Deference Must be Given to Customs?

The Customs decision in this matter explained that the fraudulent shipments which were uncovered as a result of plaintiff's provision of original information are all part of one case for purposes of 19 U.S.C. § 1619(c), as the separate counts raised by plaintiff "involve the same information that was provided about one on-going scheme involving the same commodity, the same type of fraud, a small number of importers, exported from the same country, during a defined time period." Admin. Dec. at 1. After White & Case informed Customs that its clients had learned that shipments of brake rotors were being falsely declared as theirs to evade payment of the antidumping duty, and informed the agency of the coding system that would be employed for genuine invoices, this information "was published by a single telefax within the United States Customs Service, from which the five-port investigation was triggered." *Id.* at 3. Because Customs called the enforcement efforts which were triggered by plaintiff's original information one "investigation," all of the violations were considered one case. Plaintiff's services of "reviewing certain invoices to determine whether they were genuine" was merely noted as a way that plaintiff "also assisted" Customs. *Id.* at 2.

In his opinion, Mr. Schneider explained:

My determination that White & Case's original information concerning the fraudulent importation of brake rotors involves one case is in harmony with [Customs'] policy of promoting the free flow of information from informants by encouraging informants to be forthright and to provide complete details regarding potential violations of the customs laws. If the agency is provided with frank and complete information, the agency is much better able to detect and interdict customs violations. To parse this one case into several different 'moiety cases' would not only run afoul of the nature of the agency's investigation and receipt of information, but would encourage informants to dole out information in piecemeal fashion in order [to] circumvent the statutory limitation on the maximum amount that can be awarded in any one moiety claim. This would directly negate the agency's long-standing interpretation of the Congressional intent underlying 19 U.S.C. [§ ] 1619 that the moiety laws be administered in a way that promotes effec-

tive law enforcement and full and forthright cooperation from informants. *Id.* at 3–4.

While the question of whether an informer is entitled to an award for more than one "case" is ultimately one of fact, *see White & Case*, 67 Fed.Cl. at 176, before reaching that issue the Court is confronted by a question of law—the meaning of the words "any case" in the moiety statute. The relevant provision reads: "The amount awarded and paid to any person under this section may not exceed $250,000 for any case." 19 U.S.C. § 1619(c). In a previous opinion, the Court reviewed the sparse case law on this subject, consisting of just one decision from the mutual predecessor of both our Court and the Federal Circuit. *See White & Case*, 67 Fed.Cl. at 174–76 (discussing *Cornman v. United States*, 187 Ct.Cl. 486, 409 F.2d 230 (1969)). The Court of Claims considered an older and lower version of the ceiling which, though employing a different preposition (it applied "*in* any case" rather than "*for* any case"), appears to not differ materially for our purposes. *See Cornman*, 187 Ct.Cl. at 488, 409 F.2d 230.[10]

In *Cornman*, a claimant argued that "any case" referred to any individual *violator* who was caught because a claimant provided original information. *Id.* at 492, 409 F.2d 230. Thus, he insisted that Customs was wrong to decide that the detailed information that he apparently disclosed on one occasion, leading to the discovery of violations by nineteen Japanese companies, involved just one case for purposes of the statutory ceiling. *See id.* at 489, 492, 409 F.2d 230. The court upheld the agency decision, giving "great weight" to the agency's interpretation of the statute—finding it "difficult to say that" the interpretation of " 'case' as referring to the service of furnishing original information [was] not 'at least an admissible one.' " *Id.* at 492–93, 409 F.2d 230. The court explained that "[t]he test of time adds strength to" the construction of a statute by the agency whose duty it is to execute it. *Id.* at 492, 409 F.2d 230. Customs relied on a published, 1917 decision

by the Comptroller of the Treasury, which an Assistant Secretary of the Treasury required officials to follow in a directive published that same year, and the government submitted "an uncontroverted affidavit" stating that Customs had "consistently followed and applied" the 1917 ruling. *Cornman*, 187 Ct.Cl. at 490–91, 409 F.2d 230 (discussing 24 Comp. Treas. 17 (1917) and T.D. 37279, 33 Treas. Dec. 51 (1917)); *see also White & Case*, 67 Fed.Cl. at 175–76.

▪ The government argues that *Cornman* is binding precedent for the holding that Customs' interpretation of the moiety statute must be given "great weight," Def.'s Reply at 13, and contends that deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is warranted. *See* Def.'s Br. at 21–22. White & Case argues that under the Supreme Court's opinion in *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), which attempted to clarify the doctrine of judicial deference, no deference should be given to Customs in this matter. Pl.'s Br. at 15–16; Pl.'s Reply at 9–10. The Court concludes that the form and context of this particular interpretation of the moiety statute are clearly not ones which would qualify for *Chevron* deference, under which the Court would have been "obliged to accept the agency's position" provided the interpretation was reasonable. *Mead*, 533 U.S. at 229, 121 S.Ct. 2164.

Customs in this matter applied the moiety statute in the course of reviewing a moiety claim submitted by a claimant. The opinion determined that only one "case" is presented for purposes of the statutory ceiling, because the various violations were of the same antidumping order and occurred "within the same time period," and because Customs characterized its efforts as entailing *one* investigation. *See* Admin. Dec. at 1, 3. The decision alleged the existence of a Customs "policy" of "encouraging informants to be forthright and to provide complete details,"

---

10. The change in prepositions does rule out one of the possible interpretations considered by that court, which was "to give the words 'in any case' their common, everyday meaning, i.e., 'under

any circumstances,' 'in all events,' or 'without regard to any other considerations.' " *Cornman*, 187 Ct.Cl. at 493, 409 F.2d 230.

and a "long-standing interpretation" of the intent of Congress "that the moiety laws be administered in a way that promotes effective law enforcement and full and forthright cooperation from informants." *Id.* at 3–4. But the interpretation of the term "case," resting on the similarity of the violations at issue and whether the agency labeled its actions as one investigation, does not rely on any regulations issued under notice-and-comment rulemaking, nor was it the product of a formal adjudication. The applicable regulations do not define "case," but merely note that a claim may be filed by someone who "furnishes original information concerning" customs fraud or customs law violations, 19 C.F.R. § 161.12, and elaborate that "[t]he amount of the award paid to informants shall not exceed $250,000 for any one case, regardless of the number of recoveries that result from the information furnished." 19 C.F.R. § 161.16(a).

These regulations do not prescribe a formal adjudication with a hearing, published findings, internal appeals and the like, but simply state that a Special Agent in Charge makes a recommendation on a Customs form to a port director, who does likewise and forwards the document to Customs Headquarters "for action." 19 C.F.R. § 161.16(b). This process is much less formal than the adjudications of tribunals or independent agencies to which the Supreme Court has deferred, *see Mead,* 533 U.S. at 230–31 n. 12, 121 S.Ct. 2164 (listing cases involving the Board of Immigration Appeals, the Federal Labor Relations Authority, the National Labor Relations Board, and the late Interstate Commerce Commission), or the administrative determinations to which the Federal Circuit has given *Chevron* deference. *See, e.g., Groff v. United States,* 493 F.3d 1343, 1346, 1352 (Fed.Cir.2007) (describing multistage process with an evidentiary hearing before an examiner, legal representation, required written findings and a final decision by the head of the agency); *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1381 (Fed.Cir.2001) (describing formal antidumping determinations which are published

in the Federal Register and given precedential treatment by the agency).

■ Customs does not appear to publish its moiety decisions, or to cite prior decisions as precedents. *See* Admin. Dec. at 1–6. The opinion under review was "a nonbinding disposition by a low-level agency official," and not "a formal written decision by the head of the agency." *Groff,* 493 F.3d at 1352 (citing *Mead,* 533 U.S. at 233–34, 121 S.Ct. 2164). And the moiety provision does not itself contain a Congressional direction to Customs to engage in informal force-of-law rulemaking, *see* 19 U.S.C. § 1619, but rather the agency proceeded under the general rulemaking authority that the Supreme Court found inadequate to bequeath *Chevron* deference on an informal determination. *See* 63 Fed.Reg. 11,825, 11,826 (Mar. 11, 1998) (citing for authority, *inter alia,* 19 U.S.C. § 1624); *Mead,* 533 U.S. at 231–32, 121 S.Ct. 2164. Moiety determinations, then, "are best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines'"—that is, "beyond the *Chevron* pale." *Mead,* 533 U.S. at 234, 121 S.Ct. 2164 (quoting *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)).[11]

■ After *Mead,* an agency interpretation of a law it administers that is not of sufficient formality to receive *Chevron* deference may still receive some deference under *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See Mead,* 533 U.S. at 234–38, 121 S.Ct. 2164; *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,* 400 F.3d 1352, 1365 (Fed.Cir.2005). The interpretation might reflect "experience and informed judgment" and as a consequence be given weight which "depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161; *see also Mead,* 533 U.S. at 235, 121 S.Ct. 2164 (ex-

---

11. The Court declines to follow the opinion in *Doe v. United States,* 65 Fed.Cl. 184, 187 (2005), which did not consider the impact of *Mead* on

the question of whether *Chevron* deference applied to Customs' interpretations of the moiety statute.

22

plaining that an agency ruling "may ... at least seek a respect proportional to its 'power to persuade,'" due to "the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight" (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161)).

■ Subsequent to the Court of Claims' decision in *Cornman*, the Supreme Court has refined the approach to statutory construction and judicial deference that courts must follow, in its *Chevron* and *Mead* opinions. The question of deference must be analyzed under the *Chevron* and *Skidmore* frameworks. *See Mead*, 533 U.S. at 229–38, 121 S.Ct. 2164. The Court accordingly rejects the government's argument that *Cornman* can stand for the proposition that great weight must necessarily be given to the interpretations of section 1619 made by Customs when deciding moiety claims-as *Cornman* must conform to *Mead*, not vice-versa. *See Strickland v. United States*, 423 F.3d 1335, 1338 n. 3 (Fed.Cir.2005). To the extent that the term "case" was construed by the Court of Claims in *Cornman*, however, this holding and related determinations continue to bind our Court—until the agency changes its construction of the statute in a manner garnering *Chevron* deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–85, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). When an agency proceeds with *Chevron* formality it is free to change its mind in interpreting an ambiguous statute (so long as the construction is reasonable). *See Chevron*, 467 U.S. at 863–64, 104 S.Ct. 2778; *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740–42, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996).

But although *Cornman* cannot be read, in light of *Mead*, to require that this Court give "great weight" to Customs' interpretations that are made in the course of ruling upon moiety claims, the Court nevertheless finds *Cornman* to provide guidance in the deference analysis. While the *Cornman* court muddied matters a bit with its dictum that "it is difficult to say that the statute has only one meaning," the opinion seemed to adopt the Customs construction of "'case' as referring to the service of furnishing original in-

formation." *Cornman*, 187 Ct.Cl. at 493, 409 F.2d 230; *see also id.* at 488, 409 F.2d 230. The dissent described the majority's construction as applying to "information given at any one time," *id.* at 494, 409 F.2d 230 (Collins, J., dissenting), and the Comptroller's decision that Customs claimed to be following addressed a "concrete case" of "information given at one time by an informer." 24 Comp. Treas. at 18; *see White & Case*, 67 Fed.Cl. at 175. The majority opinion is opaque on this detail, *see Cornman*, 187 Ct.Cl. at 489, 409 F.2d 230, but the decision must have rested on information that was furnished on one occasion—as the Court of Claims saw the need to rebut claimant's policy argument that the interpretation followed by Customs would "encourage informers to give out information on a piecemeal basis," rather than at once. *See id.* at 494, 409 F.2d 230. The court speculated that the agency "might well have ruled" that subsequent disclosures involved information that "was no longer 'original' after the first disclosure," as the agency "would in all probability discover the same violations later reported" when following the leads from the initial disclosure. *Id.; see also White & Case*, 67 Fed.Cl. at 175–76.

■ Thus, the *Cornman* opinion determined that when "the service of furnishing original information" is provided on one occasion by an informer, only one "case" is involved for purposes of the moiety award ceiling, regardless of the number of recoveries or number of violators involved. The current regulations are consistent with the equating of "case" with the information furnished, as the provision on the ceiling states the "one case" limit applies "regardless of the number of recoveries that result *from the information furnished.*" 19 C.F.R. § 161.16(a) (emphasis added). The *Cornman* construction was based on an "uncontroverted affidavit" that Customs had "'consistently followed and applied'" the 1917 Comptroller's ruling that "case" referred to the furnishing of information. *Cornman*, 187 Ct.Cl. at 491, 409 F.2d 230. And the *Cornman* court noted that when this service of furnishing information is provided on more than one occasion, the agency could still rule that subsequent information was not original

and thus did not involve more than one case. *Id.* at 494, 409 F.2d 230.

■ Against this backdrop, the Court notes that the Customs opinion under review does not analyze the number of cases presented with reference to White & Case's *services of furnishing information,* which were requested on more than twenty separate occasions and provided on more than a dozen different days. *See* AR at 16, 19, 20, 23, 53–55, 57, 61, 63, 66, 69, 70, 74, 76, 84, 109–17, 119, 131, 138, 140–42, 145–46, 163–65, 170–71, 173–75, 177,189, 194–96, 203–04; Attach. 2 to Pl.'s Mot. to Supp. Admin. R. Instead, the opinion focuses on the similarity of the violations and on Customs' decision to call the enforcement actions resulting from the original information one investigation. *See* Admin. Dec. at 1–4. In focusing not on the services rendered but rather their results, the opinion departs from the approach identified in *Cornman* as the consistent practice of Customs. *Cf. Cornman,* 187 Ct.Cl. at 491, 409 F.2d 230 (describing the affidavit regarding the agency's practice). The decision does not discuss whether any of the information provided by White & Case to confirm that invoices were not genuine was "original information," or even state that all of the violations would have been found on the basis of some information furnished by plaintiff earlier—despite the discussion in *Cornman,* which was highlighted in the Court's prior opinion. *See White & Case,* 67 Fed.Cl. at 175–76 (discussing *Cornman,* 187 Ct.Cl. at 494, 409 F.2d 230). The Customs opinion does not cite any authority for its interpretation, and does not claim (let alone cite evidence supporting such a claim) that its approach to interpreting "case" has been consistently, or ever, followed. Rather, the opinion states that the determination that there is only one case is "in harmony" with some other policy, and that a contrary determination would "negate" this policy. Admin. Dec. at 3–4.

Under these circumstances, the agency opinion fails to persuade the Court that any deference is owed under *Skidmore.* The opinion is wanting in "thoroughness," *see Skidmore,* 323 U.S. at 140, 65 S.Ct. 161, due to the agency's failure to analyze whether subsequent information that was provided by White & Case was "original" for purposes of the moiety statute. Its approach is not consistent with the earlier practice identified in *Cornman. Cf. id.* (describing one factor as "consistency with earlier and later pronouncements"). Its reasoning concerning the problem of information received "in piecemeal fashion" ignores the fact that the government itself requested information in this fashion. *See, e.g.,* AR at 69, 163–65, 170–71, 175, 177, 189, 195, 204 (eleven requests made on ten different days); Attach. 2 to Pl.'s Mot. to Supp. Admin. R. (request made December 28, 1999). And it cites no authority for the approach it follows. *See Eldredge v. Dep't of Interior,* 451 F.3d 1337, 1342–43 (Fed.Cir.2006) (rejecting *Skidmore* deference when no authority is cited for an interpretation). While the Court gives no deference to the agency's interpretation, this does not answer the question of whether the agency's determination was proper—the question to which we now turn.

## C. Did Customs Err in its Determination?

Section 1619 provides that when:

(1) any person ... furnishes to ... any customs officer original information concerning—

(i) any fraud upon the customs revenue, or

(ii) any violation of the customs laws or the navigation law which is being, or has been, perpetrated or contemplated by any other person; and

(2) such detection and seizure leads to a recovery of—

(A) any duties withheld, or

(B) any fine, penalty, or forfeiture of property incurred;

the Secretary may award and pay such person an amount that does not exceed 25 percent of the net amount so recovered. 19 U.S.C. § 1619(a) (2000). In addition to the 25% limit, informer awards "may not exceed $250,000 for any case." 19 U.S.C. § 1619(c). As was touched on above, the term "any case" is not further defined in the statute or the applicable regulations. Find-

ing it susceptible of several reasonable interpretations, the Court of Claims in *Cornman* adopted the interpretation that Customs had by that time been following for apparently half a century, that case "refer[s] to the service of furnishing original information." *Cornman*, 187 Ct.Cl. at 492–94, 409 F.2d 230. In so ruling, the court rejected the argument that case "can refer only to each recovery from each individual company for each violation." *Id.* at 492–93, 409 F.2d 230. The Comptroller's decision which Customs and the Court of Claims followed placed the ceiling on "the total payment for the service rendered, regardless of the number and value of the recoveries effected thereunder." *See id.* at 490, 409 F.2d 230 (quoting 24 Comp. Treas. 17).

The regulations that were subsequently adopted by Customs, while not explicitly defining "case," clearly relate payment to the service of furnishing original information. One regulation provides that informers "may file a claim for compensation, provided there is a net amount recovered from ... *such information,* unless other laws specify different procedures." 19 C.F.R. § 161.12 (2004) (emphasis added). Another provides that the ceiling applies "regardless of the number of recoveries that result *from the information furnished*.... " 19 C.F.R. § 161.16 (emphasis added). But in focusing on the *information,* the regulations neglect to inform how one is to determine how many services of furnishing information were provided by an informer, other than the statutory requirement that the information be "original." *See* 19 C.F.R. § 161.12.

In applying the moiety law to plaintiff's claim for an award, Customs determined that only one "case" is presented for purposes of the $250,000 ceiling. This conclusion was based on "the facts of this case" and "the nature of the agency's investigation." Admin. Dec. at 3. Customs concedes that prior tips did not pan out, *see* AR at 3, and that it was information received from plaintiff which "led to the triggering of the five-port investigation." Admin. Dec. at 2–3. Customs thus determined that the information provided by White & Case was "original information," and attributes to this information all of the violations identified and recoveries made

for which plaintiff claims entitlement to an award. *See id.* at 1–4.

The Customs opinion recites that the violations and collections at issue involved "a single scheme" regarding "the same violation," to avoid antidumping duties on "the same commodity" that was "exported from the same country ... within the same time period." *Id.* at 3. The original information "which led to [Customs'] enforcement activities in October 1999" is identified as having been provided by plaintiff in June 1999, *id.,* but the decision does not make clear whether this information was the knowledge of a false customs declaration, or was that the absence of a special code would identify invoices as fraudulent, or both. *See id.* at 2. And apparently because Customs' enforcement activities were conducted under the rubric of one "five-port investigation," Customs did not expressly determine whether any information furnished by plaintiff subsequent to June 1999 could be considered original for purposes of detecting any customs law violations or fraud. *See id.* at 1–6. All violations of the antidumping order are seemingly packaged as the fruits of one investigation, attributable to the information provided by White & Case in June 1999 and not to any information provided by plaintiff or others after that date.

To be sure, all of the characteristics of the violations that Customs found to be the "same" are relevant factors, under *Cornman,* for deciding whether information provided on the same occasion should be considered one service and one "case." *See Cornman,* 187 Ct.Cl. at 489, 409 F.2d 230 (noting "the false invoicing practices of several Japanese steel companies" may have differed in manner or method, but "all involved violation of the same statute"). And *Cornman* also recognized, albeit in dicta, that Customs could find that information subsequently furnished by an informer on different occasions was not original when it "involved the same thing— false invoicing practices in violation of [the same statute]." *Id.* at 494, 409 F.2d 230. In those circumstances, an informer would not be able to increase the size of a potential award by artificially creating more than one case. The Court of Claims did not, however,

suggest that subsequently-furnished information was categorically unoriginal, but left this open to an agency ruling. *See id.* And the court explained that such a ruling would be consistent with "the operation of the statute," when Customs, "on the basis of the information initially furnished, would in all probability discover the same violations later reported." *Id.* But in the decision under review, Customs failed to analyze or even specifically address any of subsequent information furnished by White & Case, and merely stated that plaintiff "also assisted [Customs] by reviewing certain invoices to determine whether they were genuine." Admin. Dec. at 2.

The government rationalizes this deficiency by arguing that the key questions in determining the number of moiety cases for purposes of the ceiling are "whether an investigation has been initiated, and if so, how many investigations were initiated as a direct result of an informant's provision of original information." Def.'s Br. at 15. Section 1619 is cited for this proposition, although the statute says nothing of the sort and does not even contain any variant of the word "investigation." *See* 19 U.S.C. § 1619.[12] The case law cited also fails to support this notion. One opinion, *Tyson v. United States,* does not mention investigations at all, but instead discussed whether information was the first the government had "concerning the fraud or violation" and led to a recovery. 91 Ct.Cl. 139, 140–42, 32 F.Supp. 135 (1940). Another opinion, *Lacy v. United States,* held that an informer did not furnish original information when information about a particular violation that resulted in the forfeiture of a jet plane had previously been furnished to the government. 221 Ct.Cl. 526, 528–30, 607 F.2d 951 (1979). The significant point was not that *an* investigation had already been initiated, but that it was an investigation *of the particular violation* for which the claimant sought a moiety. *See id.* at 529, 607 F.2d 951. The matter involved several informers, one violation and one recovery, and had nothing to do with the number of cases resulting from one informer's information.

The government also cites *Cornman* as direct support for its argument. *See* Def.'s

Br. at 16–17. But far from stating that the number of investigations which result from information has a bearing on the number of "cases" under the moiety ceiling, the only mention of "investigations" in *Cornman* shows that this factor cannot be dispositive of the issue—as the court explained that only *one* case might be presented when "the Government, after the routine instigation of *independent investigations* on the basis of the information initially furnished, would in all probability discover the same violations later reported." 187 Ct.Cl. at 494, 409 F.2d 230 (emphasis added). Whether Customs "initiated only one investigation," Def.'s Br. at 23, or several, would not seem relevant to deciding how many cases of the furnishing of original information concerning customs law violations led to net amounts recovered.

Of course, at a basic level the government is correct that an *investigation* is the predicate to an award, in the sense that if Customs ignores the original information—fails to investigate the violation it concerns—there will be no recovery and, hence, no "case." But this is a far cry from the proposition that once a broad investigation is initiated, Customs can never benefit from additional original information pertaining to the types of violations being investigated. For instance, if informer A furnishes information about violations that leads Customs to throw a large net in the area of X and Y, it does not necessarily follow that informer B's information which prompts the net to be cast in the direction of Z is not also original. Depending on the circumstances, Customs may or may not have moved in that direction absent the information from B—but whether or not a second case is presented could not possibly depend on whether Customs decided to label all use of this net one "investigation."

Customs also sought to justify its determination that one investigation means just one "case," by contending that the alternative "would encourage informants to dole out information in piecemeal fashion," thus hindering "effective law enforcement and full and forthright cooperation from informants." Admin. Dec. at 3–4. The "past and potential future cooperation" of plaintiff is identi-

---

**12.** The regulations similarly lack any reference to investigations. *See* 19 C.F.R. §§ 161.12–.16.

fied as a factor used to determine the size of the moiety to be awarded. *Id.* at 1. The government argues, however, that "the subsequent cooperation ... cannot give rise to a separate moiety 'case' unless the information leads to an additional investigation." Def.'s Br. at 23–24 (citations omitted (and unavailing)). There are several flaws with these arguments. As a factual matter, Customs itself chose to request information in a piecemeal manner, *see* AR at 163–65, 170–71, 175, 177, 189, 195–96, 204, and it was plaintiff that suggested proceeding in a more efficient manner. *Id.* at 206. Second, based on the plain text of the moiety statute, whether "subsequent cooperation" results in additional "cases" should turn on whether the information furnished is original, *see* 19 U.S.C. § 1619(a), not on how enforcement actions are structured.

Third, it does not follow that if Customs—instead of using a "one investigation, one case" rule—were to determine the originality of subsequently-provided information based on the facts of each claim, then informers would be less forthright and cooperative. Customs can certainly consider factors such as when information was obtained by the informer and whether violations would have been discovered based on prior information. *See Cornman,* 187 Ct.Cl. at 494, 409 F.2d 230. The problem here is that this determination was neglected. Finally, the lack of any published regulations informing potential informers of the factors Customs considers in making moiety determinations undercuts any professed concerns about the informers' incentives. *See White & Case,* 67 Fed.Cl. at 174. Absent such notice, incentives may be blunted by the failure to understand the amount of cooperation that is expected to maximize a moiety award, or overinflated by a mistaken belief concerning when cooperation gives rise to more "cases." [13] In any event, the "policy of promoting the free flow of information," Admin. Dec. at 3, cannot be pursued in a manner that fails to compensate informers for the original information they furnish. Congress by statute has provided that this information is not "free." *See* 19 U.S.C. § 1619.

■ The Court's rejection of defendant's interpretation of the moiety statute, however, does not mean that plaintiff's interpretation is accepted. Indeed, White & Case's interpretation—that each invoice it verified as false is a separate "case"—cannot be squared with *Cornman,* despite plaintiff's attempts to do so. *See* Pl.'s Br. at 9–14. In *Cornman,* the Court of Claims upheld the determination that "detailed information about the false invoicing practices of several Japanese steel companies" constituted just one case, although fines and duties were recovered from 19 different companies. *Cornman,* 187 Ct.Cl. at 489, 492–94, 409 F.2d 230. The court did not even find it important whether specific information was provided about each company, acknowledging there was "nothing in the record to show the exact manner of invoicing employed by the companies or whether the same method was used uniformly throughout the industry." *Id.* at 489, 409 F.2d 230. What mattered was that the information involved the same statutory violation, and was apparently furnished on the same occasion. *See id.* at 489–94, 409 F.2d 230. *Cornman* approached the service of furnishing information by looking at *when* the information was provided, and chose not to adopt an alternative interpretation that would "require breaking down the violations of each company into each separate shipment." *Id.* at 493, 409 F.2d 230. At least when violations of the same statute are concerned, *Cornman* stands for the proposition that information given at one time, no matter its volume and variety, is one "service" for purposes of the one "case" moiety ceiling.

■ Thus, ninety-eight cases are not presented for purposes of the ceiling. But are there more than one? It is disappointing that Customs failed to even address the question of whether any of the subsequently-furnished information was rendered unorigi-

---

13. The Court notes that it is far from clear that Customs, in administering a money-mandating statute, may properly add conditions to the entitlement that are not statutorily required, such as cooperation that goes beyond the furnishing of

original information. *Cf. Althen v. Sec'y of HHS,* 418 F.3d 1274, 1280–81 (Fed.Cir.2005) (holding that it is impermissible to require elements of proof not appearing in the text of the Vaccine Act).

nal by the ability to discover violations based on prior information. *See White & Case*, 67 Fed.Cl. at 174–76. But the review of the agency determination does not end with the conclusion that the law was misconstrued, as the record may contain substantial evidence to support the conclusion that all subsequent information was unoriginal—and thus support the ultimate decision that only one case was presented. The LA Customs official who worked most closely and frequently with the plaintiff affirmed that information from the plaintiff "did substantiate fraudulent information and was original information." AR at 3. Plaintiff's assistance beginning in mid-November was described as "the invoice verification system," which was "timely" and "consistent" and "was instrumental in the development of enforcement actions as part of the intervention." *Id.* at 2–3. But whether the verification information itself can be considered original is not discussed. *See id.* at 1–3.

The record shows that by June 1, 1999, plaintiff supplied Customs with information substantiating the suspicion that payment of the antidumping duty was being evaded, and with the special code by which genuine CAIEC and Laizhou CAPCO shipments could be identified. AR at 145–46. The code was effective that day, *id.*, and thus the Court concludes that any invoices falsely declared to be from either of those two companies, for shipments on or after June 1, 1999, are the fruits of the original information that was the special code itself. It is reasonable to presume that these invoices were identified as suspect because the code was absent, and thus the verification, while helpful, did not furnish original information regarding these. By the Court's reckoning, this would mean that counts 9–19, 21–23, 27, 31–32, 62–66, 70–76, and 95 were all part of one case.

White & Case then furnished Customs with information concerning two pre-June 1 shipments which were fraudulent. AR at 312–17. This information was provided on the same day, and apparently was made known to plaintiff after June 1. *See* AR 316 (fax dated June 4, 1999). These two shipments, counts one and two of the Complaint, would constitute a separate case. On Octo-

ber 14, 1999, at Customs' request plaintiff confirmed that an invoice, numbered "SWD089," was false. AR at 138–39. While two other invoices that fall in sequence immediately before this one were apparently dated June 11, 1999, *see* AR at 63, no date is given for this particular invoice and thus the Court cannot conclude it was identified due to the absence of the special code. The verification of this invoice, count three in the Complaint, will thus be considered its own case. Similarly, on October 26, 1999 plaintiff responded to a request made the previous day to verify that three invoices, whose dates do not appear in the record, were false. AR 131. This response, which is the basis of counts 4–6 of the Complaint, will be treated as one case. And on November 3, 1999, plaintiff confirmed that two shipments declared to be from another pair of its clients were false. AR 119–20. The special code for CAIEC and Laizhou CAPCO shipments obviously did not directly result in these invoices becoming suspect, and the Court will not speculate as to any indirect connection. This response, corresponding to counts seven and eight of the Complaint, will thus be treated as constituting a separate case. Two other counts, 68 and 69 in the Complaint, concern two false invoices declared as coming from one of these other two clients, CNIM. The information was requested on the same day, *see* AR at 174, and provided on the same day, *see* AR at 53, and thus these two counts constitute one case.

On November 8, 1999, at the request of Customs, *see* AR 132, White & Case furnished Customs with comprehensive and detailed lists of genuine CAIEC and Laizhou CAPCO invoices for shipments from January 1, 1999 through October 27, 1999. *See* AR at 109–17. While this information should not be considered original as it pertains to shipments made on or after June 1, as the presence or absence of the special code would identify false shipments from that date forward, it did enable Customs to identify false invoices bearing dates from the first five months of that year. As a consequence, counts 20, 24, 26, 28, 30, 49–54, 56–60, 77–94 and 96–98 of the Complaint are the fruits of these lists and should be considered part of one case.

After November 8, then, Customs had "a fool-proof system to identify all shipments from January 1, 1999 onwards that were falsely declared as being shipments from Laizhou CAPCO or CAIEC." AR at 110. Accordingly, thereafter only information furnished by plaintiff concerning violations that pre-date 1999 could be considered original. Reviewing the record for invoices with either no date or a pre–1999 date, the Court concludes that as many as four additional cases appear to be presented: (i) count 25, requested on November 24 and provided on November 30, see AR at 66, 69, 196; (ii) counts 29 and 33–48, requested on December 1 and provided on December 6, see AR at 63, 195; (iii) counts 55 and 61, requested on December 7 and provided on December 8; and (iv) count 67, concerning a September 1998 violation of which plaintiff informed Customs on December 13, 1999. See AR at 54–55.[14]

In summary, substantial evidence in the record fails to support the determination that White & Case's moiety applications concerned only one "case" for purposes of the $250,000 ceiling. Rather, the evidence in the record supports the conclusion that eleven different cases are presented. Accordingly, Customs' decision is not only based on "an incorrect interpretation of the applicable law," but is also "unsupported by evidence in the record." Doe, 100 F.3d at 1583. Defendant's motion for judgment on the record is, as a consequence, **DENIED.** Plaintiff's motion for partial judgment on the administrative record, based as well on an incorrect interpretation of the moiety law, is also **DENIED.**

### D. The Matter is Ripe for Court Review

The government's renewed motion to dismiss the case as unripe, under RCFC 12(b)(6), is predicated on its contention that only one "case" was presented for purposes

of a moiety. See Def.'s Br. at 26–30. In supplemental briefing requested by the Court, defendant concedes that, if plaintiff's counts are organized into the eleven "cases" as was found above, then for at least two of the resulting "cases" recoveries have been made and all collections actions are completed. See Def.'s Resp. to Ct.'s July 17, 2008 Order at 7. Thus, for the reasons described in the Court's prior opinion, see White & Case, 67 Fed.Cl. at 173–74, the matter is again found fit for review, and defendant's motion to dismiss for lack of ripeness is, once more, **DENIED.**

Neither party is of the opinion that a remand is appropriate. See Pl.'s Supp'l Br. at 5; Def.'s Resp. to Pl.'s Supp'l Br. at 3. The Court requests that counsel confer, discuss among other things the prospects of a settlement, and file a Joint Status Report on or by September 8, 2009, proposing a schedule for further proceedings.

### III. CONCLUSION

An office of the United States Border and Customs Protection issued an opinion concluding that plaintiff's moiety claims are just one "case" for purposes of the per case limit. This determination is not supported by record evidence and is based on an incorrect interpretation of 19 U.S.C. § 1619. As a consequence, the government's motion for judgment on the record is **DENIED.**

Plaintiff's motion for partial judgment, which sought to establish that ninety-eight separate "cases" are presented for purposes of the limit, also rests on an incorrect interpretation of the moiety statute and is **DENIED.** The Court concludes that eleven separate moiety "cases" subject to the section 1619(c) limit are presented, as described above.

---

**14.** It is possible (maybe even probable) that some or all of these invoices were viewed with suspicion because they came from an importer that had calendar year 1999 invoices identified as fraudulent due to their absence from the comprehensive lists or the absence of the special code. But the record fails to contain any evidence showing that these pre–1999 invoices could be determined to be fraudulent without additional information from plaintiff. The government has

offered to present, for in camera review, what it describes as "sensitive law-enforcement privileged documents" that can show that plaintiff's continued cooperation was unnecessary. Def.'s Br. at 25. The agency opinion fails to even address this matter, and such non-record evidence in any event cannot justify the agency's decision. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

Since claims are ripe for the Court's review, defendant's motion to dismiss for failure to state a claim upon which relief can be granted is **DENIED.** The parties shall file a Joint Status Report on or by **September 8, 2009,** suggesting a schedule for further proceedings.

**IT IS SO ORDERED.**